1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   WILLIAM TAYLOR,                        Case No. 21-cv-08712-WHO

8              Plaintiff,
                                           ORDER GRANTING MOTION FOR
9       v.                                 SUMMARY JUDGMENT

10  INTERNATIONAL UNION OF                 Re: Dkt. No. 89
    PAINTERS AND ALLIED TRADES, et al.,
11
               Defendants.
12

13         William Taylor, a journeyman member of the International Union of Painters and Allied

14  Trades ("IUPAT"), District Council 36, Local Union 510, brings this suit against his union and six

15  union officials alleging that they engaged in a series of financial and other improprieties in

16  violation of 29 U.S.C. § 501 of the Labor Management Reporting and Disclosure Act of 1959

17  ("LMRDA").  In his opposition to defendants' motion for summary judgment, Taylor failed to

18  offer evidence to support many of the allegations in his second amended complaint ("SAC") in

19  order to create a material dispute of fact.[1]  His claims cannot succeed because the IUPAT

20  Constitution does not require what he wants, he has not shown that defendants took improper

21  benefits or acted in bad faith, and defendants' decision-making is entitled to deference.  They fail

22  as a matter of law and for lack of proof.  For the reasons discussed below, defendants' motion is

23  GRANTED.

24

25

26

27  [1] In opposition to defendants' motion for summary judgment, Taylor submitted a joint opposition
    and declaration, Opposition to Motion for Summary Judgment and Declaration of William Taylor
28  ("Taylor Decl./Oppo.") [Dkt. No. 103], along with several hundred pages of exhibits.  Going
    forward I will refer to Dkt.  No. 103 as "Taylor Decl./Oppo."

United States District Court
Northern District of California

## BACKGROUND

Taylor asserts several claims arising from his dissatisfaction with union leadership in IUPAT, which represents workers in the finishing trades, including industrial and commercial painters, drywall finishers, wall coverers, glass workers, and convention and show decorators. Williams Decl. ¶ 1 [Dkt. No. 94]; *see generally* IUPAT Constitution ("IUPAT Const."). I will include the relevant factual background for these claims in the discussion of each claim.

Taylor brought suit on November 9, 2021. [Dkt. No. 1]. I twice dismissed his complaint for failing to plausibly state claims under section 501 of the LMRDA. Dkt. Nos. 15, 34. The SAC asserted not only claims under Section 501, but also Sections 101, 301 and 302 of the LMRDA. Dkt. No. 35. I granted defendants' motion to dismiss the SAC for Claims Three, Four, Five, and Twelve, but allowed Claims One, Two, Six, Seven, Eight, Nine, Ten and Eleven (all of which asserted section 501 claims) to proceed through discovery. ("Prior Order") [Dkt. No. 47]. Defendants moved for summary judgment thereafter. ("Mot.") [Dkt. No. 89]. [2]

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[2] In addition to the arguments based on the merits of Taylor's claims, defendants assert that Taylor has failed to meet a condition precedent for filing suit against defendant Williams as an individual union official and ask that he be dismissed from the case. Mot. 17:9-17; *see* 29 U.S.C. § 501(b); *Cowger v. Rohrbach*, 868 F.2d 1064, 1066 (9th Cir. 1989) (finding that before a section 501 action can proceed against a union officer, a plaintiff must establish the union, its governing board, or its officers must have refused or failed "to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization.") Williams has served as the IUPAT General President since September 2021, and before that was a member of the General Executive Board. While defendants are correct that Taylor never specifically asked the union, its governing board or its officers to take action against Williams, *see* Lalas Decl., Ex. A (Tr. at 111:9-16), that does not necessarily mean Taylor cannot sue Williams. Taylor sent letters challenging the contract ratification vote and the bylaws referendums to the General Executive Board while Williams was a member of that board. If Williams had any authority over the issues that Taylor raised, then complaining to the union about how those issues were handled would seem to be the equivalent of complaining to the union about Williams' conduct. Taylor alleges that he specifically informed Williams (in Williams' position as a member of the General Executive Board) of the alleged violations that constitute Taylor's claims Seven, Nine, and Ten. Taylor also alleges that Williams subsequently failed to respond to Taylor's request for "appropriate corrective action." SAC ¶¶ 127-131, 140-141, 145-146. I will assume without deciding that Williams is a proper party and grant summary judgment in his favor as discussed in this Order.

United States District Court
Northern District of California

law." Fed. R. Civ. P. 56(a).   To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I.       SCOPE OF LMRDA SECTION 501

Section 501(a) of the LMRDA imposes upon a union's "officers, agents, shop stewards, and other representatives" the duty to, among other things, "hold its money and property solely for the benefit of the organization and its members"; to manage, invest, and spend according to the union's governing documents; and "to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization." 29 U.S.C. § 501(a).  When one of those officers is alleged to have violated those duties, § 501(b) allows union members to sue in district court.  *Id.* § 501(b).

Section 501 "serves as a means for courts to intervene in union affairs when a fiduciary breach is demonstrated, and such a breach occurs when union officials fail to comply with the union constitution." *Lodge 1380, Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps. (BRAC) v. Dennis*, 625 F.2d 819, 828 (9th Cir. 1980) (citing 29 U.S.C. § 501(a)). The Ninth Circuit has rejected a narrow reading of section 501 that constrains its applicability to

financial breaches of fiduciary duty, holding that "union officials have fiduciary duties even when no monetary interest of the union is involved," and that Congress intended for section 501 to apply to "fiduciary responsibilities of union officials, agents, and representatives, in any area of their authority." *Stelling v. Int'l Bhd. of Elec. Workers Loc. Union No. 1547*, 587 F.2d 1379, 1386-87 (9th Cir. 1978).

*Stelling* is central to my analysis of the breach of fiduciary duty claims that Taylor makes. There, individual members of Alaskan Local 1547 of the International Brotherhood of Electrical Workers ("IBEW") sought declaratory relief under section 501 of the LMRDA, claiming that local union officials violated the IBEW constitution in failing to submit a bargaining agreement to the union membership for ratification vote. *Stelling*, 587 F.2d at 1381. Local unions had been notified of the new agreement via letter; all but one of the affected IBEW locals approved the agreement, but it was never submitted to the membership for a vote. *Id.* Plaintiff-appellants asked local union officers to sue the international to require a ratification vote by the membership, and they refused. *Id.* Plaintiff-appellants filed suit.

The district court granted summary judgment for the union because its interpretation of the constitution was reasonable. *Id.* The Ninth Circuit affirmed, confirming the principles that courts do not "have power to intervene in intra-union affairs at slight provocation or on any invitation," but rather, a court should intervene "only with great reluctance." *Id*. at 1387. "The proper inquiry has been described as 'whether there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight.'" *Id.* at 1389 n. 10. The court also clarified that even when there is ambiguity in union constitution provisions and the constitution has been breached, if "no bad faith on [the union officials'] part has been shown, the courts should not disturb the union officials' interpretation." *Id.* "Viewing the constitution as a whole, the appellees' interpretation of the constitution [was] not patently unreasonable," and because no bad faith was shown, the court determined that it should not disturb the union officials' interpretation of the provision at issue. *Id.*

Another relevant case is *Servs. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, where the Ninth Circuit explained that even if a union official's action is authorized, section 501

4

liability can still attach under certain circumstances. 718 F.3d 1036, 1049 (9th Cir. 2013). There, an international union representing service employees and its local affiliate brought suit against local union officials under the LMRDA, alleging breach of fiduciary duty. *Serv. Emps.*, 718 F.3d at 1042. A jury determined that local union officials diverted union resources and undertook actions designed to weaken the local union in an attempt to establish a new competing local union. *Id.* at 1043. The Ninth Circuit noted that "often, if a union official's act has been authorized by constitution, bylaw, resolution, or by vote of the membership"—which the court referred to as the "authorization defense"—"liability under § 501 attaches only if: (1) the officer benefitted personally from the act; or (2) the act is patently unreasonable or taken in bad faith." *Id.* at 1049 (citing *Guzman v. Benova*, 90 F.3d 641, 647 (2d Cir. 1996)). The court stated that local union officials cannot assert the "authorization" defense if their actions contravene the international union's constitution. *Id.*

      With that background, I now consider Taylor's claims.

## II.     CLAIMS 1 AND 2 – AUDIT AND FINANCIAL REPORTING REQUESTS

      The first two claims involve the alleged failure to provide required financial reporting and to act on Taylor's demand for an audit. Taylor seems to zero in on the way defendants Williams, Robles, and Bigelow addressed those concerns by not acting positively on his motion in 2017 for an audit of the Joint Apprentice Training Committee ("JATC").[3]

      The JATC is a training program affiliated with Local Union 510 (or "LU 510"). Until 2016, the JATC was funded by LU 510 trust ("the training trust"). Taylor Decl./Oppo. 4:18-22. District Council 36 (or "DC 36"), an intermediate body affiliated with the IUPAT, appointed trustees to serve on boards of two separate regional JATCs. Robles Decl. ¶ 7. In December 2016, the two JATCs merged. Since the merger, union members no longer make contributions to the JATC trust fund; it is instead funded by contributions by employers as outlined in their collective

---

[3] These claims are not well defined in the pleadings or addressed in Taylor's opposition to the motion for summary judgment. He is representing himself. I was able to appoint pro bono counsel for him earlier in the case for the limited purpose of participating in an early neutral evaluation, in the hopes that Taylor's claims could be clarified if not resolved. Dkt. No. 58. Unfortunately, neither of those things occurred.

United States District Court
Northern District of California

bargaining agreements.  Robles. Decl. Ex. A*.,* Art. 4.  The JATC is governed by board of trustees whose responsibilities, including how fund assets should be managed, are defined in a "Trust Agreement."  Robles Decl. ¶ 8 [Dkt. No. 93]; *Id.* Ex. A ("Trust Agreement") [Dkt. No. 93-1].

Taylor says that from 2014 through 2017, union officials did not make financial reports to the membership as required by the IUPAT Constitution.  Taylor Decl./Oppo. 6:8-15.  Beginning in January 2017, Taylor made several requests to DC 36 officers for information on Local 510's finances.  *Id*.  In July of that year, he authored a motion seeking an audit of the training program and "all financial information and records related to it," which the membership passed.  However, union officials did not conduct the audit.  Lalas Decl. Ex. B [Dkt. No. 96-2]; *see also* Taylor Decl./Oppo. 7:1-2, 2-4.  As a result, in February 2018, Taylor filed intra-union charges against Bigelow and other union officials to compel them to comply with the audit and provide other information about the union's finances.  *Id.* 7:26-27, 8:1-3; *Id.* Ex. 9 (charging document).

A trial was held on May 1, 2018; the DC 36 trial board found that the LU 510 officials were not guilty and dismissed Taylor's charges.  Nonetheless, in "May to June 2018," Bigelow and Collins did give Taylor two tax forms related to the trust fund; Taylor alleges that those documents did not satisfy his request.  Taylor Decl./Oppo. 10:5-11.  On September 6, 2018, the JATC board of trustees, whom LU 510 officials said had authority over Taylor's motion for the audit, decided that he was not entitled to one.  Worth Decl. ¶ 8, Ex. B [Dkt. No. 95-2].

There are several problems with Taylor's claims.  Concerning the demand for an audit, after reviewing the IUPAT Constitution I find no section that required these defendants to initiate one.  He refers to the "Parliamentary Rules and Ritual" section of the Constitution, but it does not contain a substantive right to an audit.  *See generally* Williams Decl. Ex. A [Dkt. No. 94-1] (IUPAT Const. "Parliamentary Rules and Rituals") at Robles0800-0809.  As defendants argue, they were under no obligation to grant Taylor's requests for an audit.

Importantly, the Trust Agreement, effective in 2017 prior to Taylor's request for an audit, demonstrates that the JATC is a separate entity from the IUPAT, DC 36, and Local 510.  Robles Decl. Ex. A [Dkt. No. 93-1] (Trust Agreement for the JATC).  This means that defendants had no authority to grant Taylor's request.  While the Ninth Circuit has not addressed this issue directly,

the Eleventh Circuit has, holding that section 501 claims do not apply to any harm to a benefit or training fund that is legally separate from a union. *See Hearn v. McKay*, 603 F.3d 897, 902 (11th Cir. 2010). So has the Hon. Christina Snyder in *Fisher v. Screen Actors Guild Amer. Fed. Of Television and Radio Artists*, where she found that plaintiffs had failed to state a section 501 claim because "a Section 501 claim does not apply to harm to a benefits fund . . . that is legally separate from a union." 2022 WL 228153, at \*15 (C.D. Cal. Jan. 24, 2022). Those decisions are persuasive and apply here. That being the case, a Section 501 claim does not lie against the defendants on that claim.

Taylor contends that defendants Williams, Robles, or Bigelow "benefitted personally from" their decision not to order an audit of the JATC, establishing a breach of fiduciary duty under *Servs. Emps. Int'l Union*. 718 F.3d at 1049. The benefit Taylor identifies is that the defendants were paid for their service as union officials but did not order the audit he wanted. During his deposition, Taylor argued that union officers who receive compensation even though they do not perform constitutionally required duties personally benefit from doing so. *See e.g.* Tr. at 45:16-19, 138:15-18, 139:14-140. But, as indicated in the preceding paragraphs, the officials did not violate the IUPAT Constitution by not auditing the JATC. Union officials are entitled to be compensated for their duties. That compensation cannot be construed as an improper benefit.

Taylor separately alleges that Collins in his role as LU 510 President and "in coordination with Bigelow" acted to "delay, [obstruct], deceive and ultimately refuse to comply with financial reporting obligations to union officers and members . . . and to block the parliamentary motions of the membership," thereby breaching his fiduciary duties to the membership. SAC ¶¶ 103, 106. The basis for this claim is that when Taylor went to Collins to explain why he wanted the information, Collins said, "I don't think you'll get it." *See* Collins Decl. ¶¶ 3, 4 [Dkt. No. 90-1]; *see also* Taylor Decl./Oppo. 8:5-11. Collins's response may have been discouraging to Taylor, but it is hardly a breach of fiduciary duty. Collins directed Taylor to pursue his motion for an audit with the JATC itself because the JATC is a separate entity; Collins understood that he had no authority to order such an audit. Collins Decl. ¶¶ 1-4; *Id.* Ex. A.

1    Taylor makes a more general claim regarding lack of financial reporting.  There are not

2    many specifics about this claim in the record, as opposed to the SAC, but essentially Taylor states

3    that he "made several inquires/requests [sic] to DC 36 officers for financial information on LU

4    510 finances" and that they were all ignored in violation of "sections 108, 109, 131(a), 139(d),

5    140(a), 162(b)(6)(8)(10), and 264(1)(5)(6)(8)(9)(10)(15)" of the IUPAT Constitution.

6    Decl./Oppo. 6:15-19.  He declares that by failing to make these "financial reportings," General

7    President Williams and LU 510 President Collins violated sections 43(a), 189, and 191, their

8    fiduciary duty to the membership, and, therefore, section 501.  *Id.* 6:21-24.

9    In contrast to the generality of Taylor's allegations, defendants produced evidence of their

10   compliance with their duties and showed that no violations occurred.  *See, e.g.* Robles Decl. ¶¶ 19-

11   22.  Taylor's allegations about financial reporting obligations were the topic of a DC 36 trial, held

12   at Taylor's request.  SAC ¶¶ 28, 34.  At the trial, and up until today, Taylor has produced no

13   evidence that defendants failed to make required reportings.  He offered only his declaration,

14   which makes conclusory statements, and two conclusory letters from LU 510 Trustee Pete Bowes,

15   which also state that the union was not making the proper financial reportings to membership, but

16   they provide no specifics or other evidence to support their beliefs.  Decl./Oppo. Exs. 10, 11.  On

17   the other hand, defendants showed that DC 36 complies with IUPAT Constitution's 131(a)

18   requirement that any need for the District Council to increase dues must be brought to membership

19   for a vote.  *See* Robles Decl. ¶ 19.  They established that an IUPAT-appointed auditor reviewed

20   the finances of DC 36 when Robles became Business Manager, which fulfilled requirements under

21   IUPAT Const. § 131(d)).  *Id.* ¶ 20.  Taylor provided no evidence that defendants violated sections

22   108, 109, 131(a), 139(d), 140(a), 162(b)(6)(8)(10), or 264(1)(5)(6)(8)(9)(10)(15) of the IUPAT

23   Constitution, only some of which involve the union's financial reporting obligations in any event.

24   In sum, while Taylor may believe that defendants breached financial reporting

25   requirements enshrined in the IUPAT Constitution and otherwise breached their fiduciary

26   obligations to him and the membership, he has provided no evidence that defendants violated his

27   rights in violation of Section 501.  Defendants' motion for summary judgment as to claims One

28   and Two is GRANTED.

United States District Court
Northern District of California

8

### III.  CLAIMS 7, 9, AND 10 – BYLAW REFERENDA

The LMRDA requires every member of a labor organization to have equal rights and privileges to vote in elections or referendums.  *Supra* I; *see Stelling*, 587 F.3d at 1387.  Taylor alleges that defendants violated section 109, 125, and 191 of the IUPAT Constitution by failing to adhere to voting requirements for several bylaws' referenda, primarily by failing to give members sufficient notice.  *See* SAC ¶ 130 (Claim 7), ¶ 139 (Claim 9), ¶ 144 (Claim 10).

The basis of claims 7 and 9 is the alleged lack of notice for voting on the bylaws.  With respect to Claim 7, on or about July 24, 2018,[4] Taylor received notice of a bylaws referendum set for August 4, 2018.  Taylor Decl./Oppo. 16:15-17; *id.* Ex. 22 [Dkt. No. 103-2]; *see also* Hanson Decl. ¶ 4 [Dkt. No. 91].  He wrote a letter to union officials stating that he believed proceeding with the referendum would violate the IUPAT Constitution because District Council 36 did not have the requisite approval of council delegates before submitting the referendum to members and did not provide members with proper notice of the vote.  *Id.* 18:13-22.  He requested that they "take corrective action," but no such action was taken.  Taylor Decl./Oppo. 18:13-17; *see also id* Exs. 24, 25.  Similarly, for Claim 9, on or about August 7, 2021, Taylor received notice of a bylaws referendum set for August 21, 2021.  Taylor Oppo./Decl. Ex. 45.  Taylor challenged it for the same reasons that he challenged the August 4, 2018, referendum, and because he believed it to be a violation of then-existing COVID-19 health orders.  Taylor Decl./Oppo. 26:17-27:12; *see also* SAC ¶ 80, Ex. E.  As for Claim 10, Taylor also challenged the September 8, 2021, bylaws referendum as being in violation of local COVID-19 health orders and because it was held in a location Taylor believed to be inconvenient to many union members.  SAC ¶ 80; SAC Ex. F.  Taylor's challenge was denied; General President Williams explained in the denial letter that bylaw referendum was held in accordance with the IUPAT Constitution.  *See* Taylor Decl./Oppo. Ex. 44 (letter from Williams to Taylor, explaining that per IUPAT Resolution 20-01, ratification votes may be held by any means the business manager/secretary treasurer deems appropriate, so long as ballot secrecy is maintained).

---

[4] Taylor states that he received this notice "[o]n or about July 24, 2018," in his Decl./Oppo., and alleges that he received it "[o]n or about July 23, 2018," in his SAC.

1       Taylor misunderstands the IUPAT Constitution.  First, section 191, one of the three

2    sections of the IUPAT Constitution he identifies, is specific only to the duties of local union

3    presidents and their obligation to appoint committees and call "special meetings" when requested

4    by at least 10 percent of the members.  IUPAT Const. § 191.  Section 191 is not relevant to claims

5    Seven, Nine, and Ten because these claims are not brought against Collins, who was the union

6    president at the relevant time.

7       Second, sections 109 and 191 are unrelated to bylaws referendums, which are only

8    addressed by section 125.  Section 109 discusses members' general obligations to adhere to

9    bylaws of their District Council and Local Union and "faithfully carry out such duties." IUPAT

10   Const. § 109 (stating section 109 is not a consideration when determining whether district council

11   or local union violated bylaws referendum requirements).

12      Third, section 125, found in the "Bylaws" section of the IUPAT Constitution, requires that

13   "[n]otice shall be given by mail to the membership of the District Council at least 15 days prior to

14   the meeting(s) at which the members will consider and vote on the question.  Such a meeting may

15   be regular or special." Williams Decl. ¶¶ 17; *id.* Ex. B [Dkt. No. 94-2] (IUPAT Const. § 125(c)).[5]

16   This language is also reflected in sections 167 and 169 of the IUPAT Constitution, which address

17   local union bylaw referendums and lays out the same notice guidelines.   IUPAT Const. § 167-

18   169.  That is the notice provided by the District Council and Local 510: they sent out mail

19   notifications to the voting members 15 days prior to the vote.  Taylor's interpretation is that

20   section 125 requires members to "have a copy of the notice [in hand] . . . 15 days before the vote,"

21   Oppo. 17:16-17, but the Constitution requires that <u>mailing</u> occur at least 15 days in advance.

22   Defendants declare that the term "given by mail" to the membership has always been construed by

23   the IUPAT as the date when the District Council or Local Union mailed the notifications out to the

24   membership and not the date members receive it because of the "vagaries of the mailing services

25   outside of the union's control."  Williams Decl. ¶ 18-23 [Dkt. No. 94].

26

27

28   [5] This is § 124(c) of the old IUPAT Constitution.

United States District Court
Northern District of California

1       Defendants' approach to notifying union membership of the bylaws referendum in

2 question was in line with the IUPAT Constitution's rules governing both international and local

3 unions' bylaws referendums. Nothing suggests that the practice adopted by the union is patently

4 unreasonable or adopted in bad faith. As such, I give it deference.[6] The same is true for the

5 location of the bylaws referendum; nothing suggests that the location was out of line with IUPAT

6 Constitution requirements or otherwise chosen in bad faith. *See* Taylor Oppo./Decl. Ex. 44. The

7 Ninth Circuit encourages courts to defer to the perspective of the union officer when determining

8 what constitutes due notice. *See Stelling*, 587 F.2d at 1389 n. 10.

9       There is no evidence of a violation of the IUPAT Constitution during the challenged

10 referenda. The union has shown that the exact text on which the union wanted the members to

11 vote was provided to members 15 days prior to the election, which is all that is required by the

12 IUPAT Constitution. *See* Dkt. No. 91-1 at 16 (mailer from DC 36 identifying due rates for August

13 2018 bylaws referendum); Dkt. No. 91-2 at 22 (mailer from DC 36 identifying same for August

14 2021 bylaws referendum). There is no genuine dispute that the union complied with the

15 constitution in conducting the bylaw referendum votes at issue. *See* Hanson Decl. ¶¶ 4, 7, 9 [Dkt.

16 No. 91]; Worth Decl. ¶ 19 [Dkt. No. 95]; Williams Decl. ¶ 17 [Dkt. No. 94]. There is no evidence

17 that the referenda were conducted in bad faith. The defendants' interpretation of the constitution

18 as applied to carrying out the vote was not patently unreasonable. Defendants' motion for

19 summary judgment as to claims Seven, Nine, and Ten is GRANTED.

20

21

22 _____

[6] Taylor also wanted a "redline copy" of the 2018 bylaws referendum sent to the members. While
23 that would have been helpful, the IUPAT Constitution requires only that "the membership be
provided the exact text, including the new rate of dues, which is being asked to vote on." Williams
24 Decl., Ex. C; IUPAT Const. §§ 125(c), 167-169. Failure to send a "redline copy" is not evidence
of bad faith or unreasonableness. The union officials' interpretation of their constitution is owed
25 deference so long as it appears reasonable and in good faith. *Servs. Emps. Int'l Union*, 718 F.3d,
at 1049.

26 Taylor also alleges that "the members of the DC 36 Bylaws Committee sought changes in the
27 bylaws that created pay raises for themselves . . . [t]his information . . . was hidden from the
members by way of the 'notice' and violated the IUPAT Constitution." SAC ¶ 69. Taylor offers
28 no evidence in support of this allegation.

United States District Court
Northern District of California

## IV.    CLAIMS 8 AND 11 – CONTRACT RATIFICATION

Section 252 of the IUPAT Constitution states that, "[i]n no case shall a District Council or an unaffiliated Local Union take any . . . contract ratification action until all affected members in good standing have been duly notified.  It shall be the duty of the Business Manager/Secretary Treasurer or the Business Manager to give the affected members reasonable notice of any such action." IUPAT Const. § 252.  Taylor asserts in claims Eight and Eleven that Williams, Robles, and Bigelow failed to adhere to notice and voting requirements for collective bargaining agreement ratification votes.  SAC ¶¶ 127-151.  He claims that five days' notice by mail, which was given for the April 17, 2021, ratification, and 7- or 8-days' notice, which was given for the March 30, 2022, ratification, was improper.  SAC ¶¶ 72, 82; Decl./Oppo. 24:21-27; *id.* Ex. 39.  He also asserts that the April 17, 2021, CBA ratification, was improper because the notice was not for a "special meeting called for that purpose," Oppo. 25:4, and further alleges that Local 510 failed to comply with local Covid-19 orders (San Mateo County Order No. C19-11).  *Id.*; Mot. 22:12-17.  Taylor claims the same for the March 30, 2022, CBA ratification vote.[7]

As opposed to the 15-days required for a bylaws referendum, the applicable constitutional sections for contract ratification (§§ 233 and 252) require reasonable notice, and the union officials' interpretation of what reasonable notice means is entitled to deference.  *See Servs. Emps. Int'l Union*, 718 F.3d 1049.  Claims Eight and Eleven fail because all that is required is that the membership be "duly notified," and the notice that was given complied with the long-standing practice of IUPAT's union officials[8], which was not unreasonable or set in bad faith, and the relief Taylor seeks is now moot because the Covid-19 order he cites has since been lifted.

In the case of the April 17, 2021, contract ratification vote, by Taylor's account "membership was informed, on or about April 12, 2021, at 3PM . . . that the 'special meeting' for

---

[7] Taylor also tried to delay the March 30, 2022, referendum on a collective bargaining agreement, citing the same procedural grounds, this time via a temporary restraining order that I denied.  Mot. for TRO [Dkt. No. 27]; Order Denying Mot. for TRO [Dkt. No. 31].  He also challenged this referendum; Williams denied his request.  Williams Decl. Exs. G-H [Dkt. No. 94-7, 94-8].

[8] Williams testified that he and the IUPAT have always interpreted sections 233 and 252 to require "due notice under the circumstances to ratify an agreement, not a fixed number of days' notice." Williams Decl., ¶ 20.

a referendum on a LU 510 CBA was still to take place on Saturday, April 17, 2021." SAC ¶ 73. Williams, the General President, testified that when a union authorized a strike vote and expiration of a current contract would lead to work stoppage (as here)), ratification of a contract often would happen "immediately preceding" the expiration of the existing agreement. Williams Decl. ¶¶ 21-22; Ex. H [Dkt. No. 94-8] ("Requiring members to work without a contract or remain striking to satisfy an arbitrary notice period [as Taylor insists] would cause significant undue harm to the Union and its members."). Nothing suggests that giving five days' notice of the CBA ratification vote was unreasonable or constituted bad faith.

Section 233(b) of the IUPAT Constitution states that "[a]ll collective bargaining agreements negotiated by a District Councils or an unaffiliated Local Union shall be subject to ratification through a referendum vote of the members working under the agreement . . . the referendum vote shall be a secret ballot conducted in the regular manner at a special meeting called for that purpose." IUPAT Const. § 233(b). Taylor claims that the notice given for the April 2021 contract ratification vote was "not for a special meeting called for that purpose," Oppo. 25:4, but the letter from the General President to Taylor in response to his complaint, Williams Decl. Ex. F [Dkt. No. 94-6], explains that the vote *was* a special meeting despite there being no quorum.[9] *Id.* The General President stated that "[t]he GEB has long taken the position that, given the exigencies of ratification, no quorum is required at such meetings." *Id.* This perspective is entitled to deference.

Five days' notice is reasonable. *Stelling* is on point. The notice given by union officials to membership in advance of the special meeting was a reasonable interpretation of "duly notifying" membership and is entitled to deference. *Stelling*, 587 F.2d at 1389 n. 10 ("The proper inquiry has been described as 'whether there was arguable authority for the officer's act from the officer's

---

[9] Taylor also misinterprets section 191 to mean that special meetings may only be called by the President when requested in writing. Instead, it means that if at least 10 percent of union members in good standing, or if five members in good standing request a special meeting in writing, the President must call a special meeting. This does not mean that the President may not call a special meeting without such a request. In this case, the General President concluded that the contract ratification in question called for a special meeting and did not require a quorum. Williams Decl. Ex. F [Dkt. No. 94-6].

viewpoint at the time, not from a court's more sophisticated hindsight.'") (internal citations omitted).

The General President's interpretation of the applicable constitutional sections (§§ 233 and 252) applies to notice requirements for the second contract ratification vote on March 30, 2022. Mot. 23:16-21. By Taylor's admission, defendants sent notice of a "contract ratification vote" post-marked eight days before the vote was to take place. SAC ¶ 82 ("I received a post card from Luis F. Robles . . . post marked March 22, 2022, giving notice of a 'contract ratification vote' for . . . March 30, 2022.") This complies with obligations imposed by the IUPAT Constitution sections 233 and 252.

Finally, the public health order Taylor references in claims Eight and Eleven has since lifted. Tr. at 58: 17-59:6. Because Taylor seeks declaratory and equitable relief for an actual and present or continuing controversy between himself and defendants, this renders relief for Taylor's claim that defendants violated those orders moot.[10]

As a result, defendants' motion for summary judgment for claims Eight and Eleven is GRANTED.

## V.     CLAIM 6 – SPEECH

Taylor claims that Williams, Robles, Bigelow, Collins, Northam, and McBride violated provisions of the IUPAT Constitution by blocking and interrupting his speech at union meetings or taking or encouraging actions at meetings "designed to suppress . . . and dissuade" members from exercising their rights to attend those meetings, participate in deliberations, or express their views. SAC ¶ 125. Taylor cites section 260 of the IUPAT Constitution, which identifies types of conduct that could serve as the basis for internal union trials and hearings, such as "abusing"

---

[10]Taylor also claims that the August 21, 2021, and September 8, 2021, *bylaws* referenda were held in violation of the COVID-19 health orders. These claims are also moot. And defendants show that they did not violate the health order Taylor cites in any event. They point out that the since-lifted San Mateo County Order No. C19-11 (June 17, 2020) (the order Taylor argues defendants violated when they held the referendum) placed limits on the number of people gathered at one time to 50; it did not place limits on the number of people who can be invited to a gathering, nor did the number of people who attended the vote on April 17, 2021, exceed the limitation. Worth Decl. ¶ 16.

1    fellow members in the meeting hall.  IUPAT Const. § 260.  Additionally, he contends that this

2    violation of the IUPAT Constitution also constitutes as a fiduciary breach under Section 501.

3         The facts underlying Taylor's claim include that LU 510 Vice-President McBride shouted,

4    "[c]an't we shut him up?" while Taylor was speaking at the February 3, 2022, regular membership

5    meeting of LU 510.  McBride Decl. ¶ 3 [Dkt. No. 92]; *see also* Taylor Decl./Oppo. 14:1-2; *id.* Ex.

6    20 (minutes for February 3, 2022 regular membership meeting).  Taylor also contends that Collins

7    "as chair had an obligation to ensure members' rights of speech are protected if not respected in

8    meetings," but that Collins failed his duty.  SAC ¶ 56; Oppo. 14:6-8.  Taylor claims that

9    defendants Robles, Bigelow, and Williams, who were in attendance as union officers, "failed to

10   take any action whatsoever to safeguard members rights of speech under the LMRDA and IUPAT

11   Constitution from being denied by other union officers."  SAC ¶ 125.

12        Section 260 provides a list of acts that can give rise to internal disciplinary proceedings,

13   but committing those acts does not mean that the constitution has been violated in a way that

14   supports a claim under the LRMDA.  Taylor's claims are a case in point.  After McBride's

15   comment, Taylor "called for a point of order and asked Collins to take control of the meeting."

16   Collins called for order.  Taylor Decl./Oppo. Ex. 20 [Dkt. No. 103-1] (Local 510 General Meeting

17   Minutes from Feb. 3, 2022, showing that Collins called for order after McBride interrupted

18   Taylor).  Taylor was then able to speak.  The incident did not stop Taylor from speaking (either at

19   that or future meetings).[11]

20        While McBride should have held his tongue, that incident does not constitute a

21   constitutional violation or breach of fiduciary duty that can serve as a basis for Claim Six and

22   Section 501 jurisdiction.  Taylor has not alleged a direct violation of a constitutionally guaranteed

23   right, as would be required to invoke Section 501 in the absence of some other bad faith action or

24   personal benefit accrued by McBride or Collins.  The asserted abuse does not show that

25   defendants failed their fiduciary duty to safeguard his rights as a union member.

26

27   [11] No defendant took disciplinary action against Taylor as a result of his speech on February 4,
     2022.  Mot. 24 n.17; *see also* Worth Decl. ¶ 30.  Taylor professes to having "thick skin" and has
28   not let defendants block him from speaking at meetings.  Tr. at 251:2–14; accord Worth Decl. ¶ 29
     (no difference in Taylor's level of participation after February 3 meeting).

United States District Court
Northern District of California

1    Taylor has also not alleged facts that suggest that Collins (who, as General President at the

2    time, presumptively would have decided whether to bring intra-union charges against McBride

3    and Northam for disrupting Taylor's speech) acted in bad faith when he chose not to bring

4    charges.  He called the meeting to order, and Taylor was able to speak.  Taylor alleged in his

5    pleading that Collins, Bigelow, and others have "on several occasions used the local union

6    meeting forum as an opportunity to breed disunity within the union by painting a member

7    exercising their rights under the LMRDA as 'costing the union money'," but he provided no

8    evidence of this in his opposition.

9         Since union officials are owed deference by federal courts unless there is a showing of bad

10   faith or patently unreasonable decision-making, and since the IUPAT Constitution contains no

11   language specifically banning defendants' conduct during the February 3, 2022, union meeting,

12   defendants' motion for summary judgment on Claim Six is GRANTED.

13                              **CONCLUSION**

14        There are no disputed material facts.  Taylor's requests were not unreasonable but they

15   were not required by the IUPAT Constitution.  Deference is owed to the union officials'

16   determinations.  Defendants' motion for summary judgment as to Claims One, Two, Six, Seven,

17   Eight, Nine, Ten, and Eleven is GRANTED.  As those were the only remaining claims in this

18   case, Judgment shall be entered accordingly.

19        **IT IS SO ORDERED.**

20   Dated: November 13, 2023

21

22

23                              William H. Orrick
                                United States District Judge
24

25

26

27

28

16